If Michael Sison, the Chief of Communications Officer at 3rd Anglico, had testified, he would have testified he observed Mr. Jackson under a desk, curled up in a ball, crying because he was in so much pain. If Lawrence Nunez, Mr. Jackson's roommate, had testified, he would have testified they went to a party, someone lit a firecracker, and Mr. Jackson began shaking so badly he was paralyzed with fear and couldn't speak. And if Kevin Ray, who served in the military with Mr. Jackson, had testified, he would have testified that to someone chugging Robitussin so he could sleep at night, carrying around a binder given to him by his supervisor so he could remember what he was supposed to do that day. But none of that testimony was admitted. The district court excluded that testimony, and that testimony really went to the heart of what was this case. This case was about whether Mr. Jackson, in fact, knew that Flores was submitting false vouchers, and also whether he, in fact, had the state of mind to be guilty of those charged offenses. Now, because that was the key issue in this case, the district court erred in a number of ways, but one way I'd like to talk about is the fact that the court gave a deliberate ignorance instruction in this case, which was entirely inappropriate. And secondly, by excluding that testimony wasn't there a factual basis for the deliberate indifference instruction? In other words, there were a number of deposits made to his account. He would have wondered why those type of deposits were being made to his account. Why isn't that a deliberate indifference with deciding then further not to investigate that? I think first you have to look at the facts fairly closely. First of all, the jury acquitted of seven of the twelve counts in this case. So obviously they're not believing all of the testimony there. When you examine its Exhibit 200, which shows the chart linking each specific count and the alleged deposit either made into Mr. Jackson's account or the supposed kickback paid back to Mr. Flores, of the 27 claims the government presented, there were actually 10 of those only linked a supposed kickback. When you break down what the jury acquitted and convicted of, four of the seven counts that the jury acquitted of actually had these kickback deposits supposedly linked to the date that Mr. Jackson received his deposit. Of the counts he was convicted of, one of them didn't list a deposit. And when you look at the overall grand scheme of this case, the government doesn't dispute Mr. Jackson was entitled to rate travel. And when they break down month by month with his travel and then his incidentals and meals, he was entitled to a range of $5,526 a month up to $6,270. When you study Exhibit 200 and you look at all of those deposits, many of those are within that range. So you wouldn't necessarily notice there was anything wrong. In fact, 18 of the 27 claims the government presented were within the range he was entitled to receive. But many of the claims were when he was at the Wounded Warrior facility where he was entitled to no reimbursement. That is correct. So counts 22, 23, and 24 the jury convicted him of. Based on the assumption... So were they proper convictions on those counts on a deliberate indifference theory? No. I don't believe so at all because if you look at the record at ER 721, the record reflects that Mr. Jackson was at Wounded Warrior from January 2008 until September 2008. So counts 18, 19, 20, and 21 all would have been a time he was also at Wounded Warrior, of which the jury acquitted him of. I think what ultimately happened is McWhorter testified in his summary chart that counts 22, 23, and 24 had meals and incidentals included. Something that was not alleged in the indictment, but he added that in because he said Mr. Jackson was at Wounded Warrior at that time. I'm adding in the meals and I think the jury convicted based on the fact he was receiving his... I can't remember how he phrased it. Well, it's always dangerous to make decisions based on what we thought the jury may or may not have done. It's not really a guidepost to making a decision. That's correct. For deliberate indifference, what's the standard of review? Isn't it plain error here? I would submit that it was actually abuse of discretion because... In 1985, Mr. Jackson objected. He objected to the knowledge instruction saying it misstated the law. Well, he objected to the language. He didn't object to the instruction, at least our view. I wanted to give you an opportunity to point that out to me if he did. Well, the way I understood him at year 85, the objection was fairly... Let's read it or do you have it in front of you? I just have a summary that it misstated the law. It violated his right to due process. Were you counseled down below? I was not. Okay. Sorry. I think from at least my read, it appears that he's arguing with respect or making a request regarding the language, but it doesn't sound to me or read to me that he is objecting to the instruction. Well, when you say that you have the right to have a jury decide each element of the law, imposing the deliberate ignorance instruction, ultimately what happened here was it was almost a negligence instruction. This, especially an individual with a TBI and PTSD who's disputing knowledge, and it really was a case of he either had actual knowledge or he didn't know. This is not like Ramos Atanda where we have someone driving to the border in the dark and unloading things from a boat that just came from Mexico. This is more like Chen, a recent case before this court where the individual communicated with the conspirators before he arrived. He rented a car at the direction of the other co-conspirator and he drove around with them on the day in question. But in that case, this court held that wasn't sufficient. That didn't warrant a deliberate ignorance instruction. There just wasn't evidence that he actually had a subjective belief that those facts exist and he failed to investigate. And I'd say that's what the evidence demonstrates here as well. Were you seeking to interpose a psychiatric defense, a diminished capacity defense? You keep talking about this testimony going to knowledge, but a diminished capacity doesn't go to knowledge. It can only go to specific intent, correct? Correct. But he was charged with aiding and abetting the filing of these claims. But that intent element is an intent to aid and abet. It's different from knowledge that the reimbursements were false, correct? Yes, but I think the way the case was presented and the way that the jury saw it was, and the jury even asked a question, I believe it was note number nine, can someone aid and abet through omission? And so that's where the knowledge component comes in, was Mr. Flores even aware, or Mr. Jackson even aware that Flores is submitting these vouchers on his behalf. How do you attack knowledge short of putting in a false psychiatric defense, that he didn't appreciate the wealth and that type of evidence? Because you didn't put in that type of defense. Defense was diminished capacity. Am I correct about that? Well, it was more or less a diminished capacity based on his TBI. It was his level of functioning. Did he have actual knowledge this was happening, and did he have the capacity, or not the capacity, but the intent to be guilty of the charged offenses? But aren't there cases that say that diminished capacity does not go to knowledge, it can only go to the specific intent? And it seems like you were repeatedly talking about it going to the issue of his knowledge. Going to the, sorry, if I'm not making myself clear, simply going to the knowledge of whether he knew that Flores was doing this. And the government basically precluded a good chunk of that already by modifying the indictment on the eve of trial and eliminating the whole fraudulent theory, which got rid of an instruction on willfulness and intent to defraud. How does that, I don't understand, on the modifying the indictment, that just, that narrowed it, it didn't broaden it. I mean, I don't know how exactly your client was hurt by that. Because I think they presented an entirely different theory. Their theory of the- Well, their theory all along, I'm sorry, but it seemed like they had to show not just that it was fraudulent, but the other elements as well, that it was false. Okay, so when you look at the indictment, the indictment required that a claim be submitted on this 1351D form. That was the department's requirements. And the entire theory of the overt acts is that Flores submitted a fraudulent 1351, and then he would attach a fake hotel receipt. But it didn't add an element. It took out an element. But the government's theory of the case was a fraudulent 1351, and they just wiped that out of the language and all of a sudden changed their theory of the case to being a fake or fictitious. Fake and fictitious obviously carry very different meanings than fraudulent. And by eliminating the fraud and eliminating the intent of fraud in the willfulness instruction- What's your best case on that? Well, the jury ultimately convicted of- What's your best case? For that proposition? Yes. Well, I think you have to take maybe two propositions. One, the government is bound by the theory of the case that they allege in the indictment. There's nothing showing that he was- Can't they withdraw portions of the indictment? Those overt acts that use the language fraudulent did not go to the jury, correct? They eliminated all fraudulent language entirely. Right. So what if, as the judge asked a moment ago, what is the problem with narrowing an indictment opposed to expanding? I know practically that you had prepared early on in the case for a psychiatric defense going to the question of intent, and then they eliminated the question of intent. So I can understand in terms of preparation how that provided you with the answer, but at the end of the day, what is the problem when they narrow the charges? It's not really narrowing. They're changing it because they're saying now he submitted a false or fictitious claim, and that is nowhere stated in the indictment. They're entirely- The language of the indictment uses the term false? In the general language, but when you go to the object of the conspiracy and the overt acts describing what happened, Mr. Jackson was on notice that he submitted a fraudulent 1351 claim. Nowhere in the indictment do they allege a fake 1351 claim or a false 1351 claim. The substantive counts have the language false in them, don't they? That he aided and abetted, but then in the summary they say fraudulent claims submitted for lodging. And then I would add the other problem with the indictment is that, as we discussed earlier, he was convicted of counts 22, 23, and 24 based on meals and incidentals and lodging, and meals and incidentals is never alleged anywhere in the entire indictment. They allege that this was all a lodging case. Did you want to reserve the balance? I would. Let me just ask, Judge Gould, did you have any questions at this point? The only question I had is sort of a factual one. I was just curious if the record shows us how Jackson got involved with Flores. Well, when he was transferred to 3rd Anglico, this is the best I can answer your question, Flores was stationed there as well. And then the record does indicate that there was a social relationship, a friendship, as well as a work relationship. I don't know if that reflects that. Okay, thank you. Thank you. Good morning, and may it please the Court. Damaris Diaz on behalf of the United States. While at Wounded Warrior, Defendant Jackson submitted at least three claims totaling over $20,000 for travel pay when he was not paying anything out of pocket for either lodging or meals. But maybe we should start with one of the arguments that we were just discussing and presented by Ms. Conroy on behalf of her client. So let's talk about the difference between Yes, Your Honor. The indictment originally alleged that defendants were charged with submitting false, fictitious, or fraudulent claims to the United States. That was the language in the original indictment, and that's the language in the statute. But as this Court has repeatedly held, including Judge Amon in the Walter E.'s case, I'm sorry, that's the deliberate injury. The government is entitled in a 286-287 case to proceed only on a false or fictitious theory. In fact, this Court has you changed it to false on the eve of the trial? No, not exactly. The government was going to proceed on a theory that it was either fraudulent or it was false or fictitious. And given the amount of evidence in this case and the specific issues that were being raised, the government chose to proceed solely on a false or fictitious claim, which it was entitled to do. And I want to correct one inaccuracy where the defendant said that all of the fraudulent language was taken out of the indictment. It was only in the substantive counts of 287 violations. There were still overacts that describe the conspiracy. And in fact, in the defendant's brief, she cites two overacts, one, four, and seven, that charge Jackson with allegedly fraudulent conduct. And those overacts actually relate to Defendant Flores submitting a fraudulent claim in Defendant Jackson's name. So our theory with respect to Defendant Jackson is that he knowingly submitted false or fictitious claims. We did not proceed on the theory that he submitted fraudulent claims, that he had the intent to defraud, only that he knew that the claims that he was submitting, for which he was receiving payments over 27 months, those claims were knowingly false or fictitious. Well, you gave notice to the defendant of that before the trial started, correct, that that was your theory? Yes. It came up in the context of discussing jury instructions before trial. Let's talk about the deliberate indifference instruction. I think there's a general wording that they're not to be given freely. It's supposed to be really cautious about giving these deliberate indifference instructions. At least I think that's what our case law says. And I think you're arguing that it was appropriate here because there was sufficient evidence that Mr. Jackson was aware of a high probability that Mr. Flores was submitting false claims, but then that Mr. Jackson failed to investigate further. Is that your argument? Yes, Your Honor. So what is your strongest, I guess, argument or point that Jackson was willfully blind? Because it seems like your evidence here tended to show that Mr. Jackson knew exactly what was going on. He negotiated kickback rates for others. He regularly communicated with Mr. Flores that the time reimbursement checks were deposited into Jackson's account and that Mr. Jackson made direct deposits from Mr. Flores' account after receiving these deliberate indifferences. Yes, Your Honor. And as Your Honor knows, there was overwhelming evidence of defendant's actual knowledge. But the defense presented this case and repeatedly argued that the payment system was in such disarray that nobody knew what they were being payment paid for and when, that Flores was in charge of everything and nobody knew what Flores was doing. And so we felt there was sufficient evidence introduced at trial from which the jury could infer that where there was no actual knowledge, there was still knowledge because there was enough suspicious activity that defendant was on notice and did not investigate and possibly deliberately did not investigate. There was that statement from Miguel Polanco that at the Marine Corps ball when everybody was in a tizzy about Jackson or Flores going AWOL and they were all going to be left holding the bag for this conspiracy, where Jackson said, we didn't sign any vouchers. They can't put this on us because we didn't sign any vouchers. So I would point the court to the Walter Ease case where Judge Amon wrote about the defense that the defendant was naive and unwittingly became involved with unsavory characters who were violating the law. And that was sufficient to give a deliberate ignorance instruction where there was sufficient suspicious activity. There were kickbacks in the Walter Ease case. Repeated claims going to the same four providers, one of which was far away from the defendant. There was sufficient suspicious activity going on that the defendant was deliberately ignorant and turned a blind eye. The defense was claiming she was naive. The court found that there was sufficient evidence in the record to justify giving a deliberate ignorance instruction where there was these doubts, these suspicious activity, plus a failure to investigate. And as Judge Gould held in the Ramos-Otondo case, the deliberate ignorance theory may be an alternative to actual knowledge. And so here, the government's position was that there was overwhelming evidence of actual knowledge, but where the defense's theory of the case and the defense was that Jackson didn't know, there was sufficient evidence to warrant the ignorance instruction as well. And I suppose the jury could have rejected some of the evidence that you had of direct knowledge? Absolutely. And in fact, Your Honor, I know we don't want to speculate too much of what the jury did, but I believe the jury did, in fact, reject the evidence. The jury convicted on the last three counts when defendant was at Wounded Warrior, and the jury heard evidence – well, I should say that there's evidence in the record from counsel's statements to the court alone that defendant was at Wounded Warrior from January 2009 to September of 2009. They heard that defendant was at Wounded Warrior in June, July, and August of 2009. So only those last three counts related to the time that he was at Wounded Warrior, according to what the jury heard. And that's where they convicted, because at that time, there was no reason for defendant to be submitting false claims, or there was no reason for defendant to be submitting claims for travel, because he was not paying for lodging, and he had no out-of-pocket meals and incidentals expenses, so he shouldn't have been expecting money in his account. The jury acquitted on all the other – or almost all the other counts where defendant raided travel, and defendant could have been expecting money in his account. But for those three counts, they rejected the jury's – the defense, and they convicted on those counts. So I do think that's why the jury convicted on those counts alone. I have a question regarding Dr. Cohen. I believe that was your rebuttal witness. Yes. And it appears he examined Mr. Jackson in 2015. Yes. And I think that would have been six years after the charge conspiracy, in this case, had ended, and nine years after Mr. Jackson had been shot in the head. I'm just trying to figure out how Dr. Cohen's testimony was relevant to rebutting Mr. Jackson's mental state between, I guess, 2007 and 2009, which would have been the relevant period of this conspiracy. Absolutely. Dr. Cohen was a – is a forensic psychiatrist, and as he testified, what he does is he examines evidence. He examines medical records. He examines financial records. He basically examined much of the documentary evidence in this case and created a forensic analysis to try to reconstruct what Jackson's mental state was at the time of these offenses. So that's how his testimony is relevant. But it seems unclear to me. Was Dr. Cohen commenting on Jackson's mental status in 2015 or in – or between 2007 and 2009? It wasn't clear to me. What was the intent there? Yes. Based on his forensic psychiatric evaluation, he was opining on defendant's mental state at the time of the conspiracy. The defense raised significant evidence and introduced significant evidence of defendant's mental state at various points. They had Camden Amey talking about some of the things, actually, that Ms. Conroy talked about were being excluded. Camden Amey was talking about the defendant's pain, being curled under the desk, being too much in pain to work. You had Kevin Ray and Alex Due talking about the defendant's injury in combat and the subsequent manifestations of that. And that was laid against the desk. What subsequent manifestations? They didn't talk about anything other than what really happened that day, correct? Well, they talked about how he was delayed in getting medical treatment, how he continued fighting. And that was later discussed by Drs. Tuller and Opava-Rutter as being aggravating factors to a TBI and PTSD diagnosis. So you had Dr. Tuller and Dr. Opava-Rutter also giving testimony regarding PTSD and TBI. And all of that evidence was to lead the jury to understand what defendant's mental state was at the time of the conspiracy. On a more minor point, did the district court err in not addressing the objections that made to restitution here? No, Your Honor. I believe Rule 32 only requires that the court resolve factual disputes. And in adopting the PSR, which the court did here, and in ruling on the amount of restitution, I believe that satisfies Rule 32. But because the judge did rely on acquitted conduct, correct? Yes, Your Honor. Was he required to make an affirmative finding since the jury had acquitted on that conduct that it, in fact, took place? No, I don't believe so. In fact, the case law is clear that the jury, I'm sorry, that the sentencing court may consider all conduct that was part of the actual loss of the victim, all conduct that was in the course of the conspiracy. But it had to be reasonably foreseeable. Yes, exactly. But does he have to say, I, in fact, credit that testimony? In other words, verbally articulate that I credit that testimony even though the jury didn't? I'm just talking in terms of findings. I don't believe that the court is required to make a specific finding as to the reasons why she is awarding the restitution calculated by the PSR. And she said that she adopted the findings of the PSR. That was sufficient for Rule 32 and under the case law about restitution. So there was a statement made that the findings in the PSR were adopted? Yes, I believe so. Okay. I'd like to make a few points about the exclusion of evidence, if I may, unless the defendant's self-excluded relevant testimony on the cognitive impairments of the defendant that were concurrent with the time period here. At ER 719 through 26, there was a discussion about four additional medical professionals that the defendant had originally listed as witnesses. They were Dr. Patel, the defendant's primary care physician throughout the defendant's entire military career, including the time that he was at Wounded Warrior, Dr. Richardson, a psychologist at Wounded Warrior, Dr. Balawan, a pharmacist at Wounded Warrior, and Michael Castellana, a social worker that met with the defendant right before he went to Wounded Warrior. All of these medical professionals had contemporaneous third-party observations of the defendant during the time of the conspiracy. The defendant chose only to proceed with Dr. Tuller as a precipient witness, as a fact witness on her contemporaneous observations of the defendant. And so it was the defendant's choice, the strategic choice, that the defendant at 722 says that's a matter of defense strategy, which witnesses she was going to call, I'm sorry, which witnesses counsel was going to call to support this evidence. The court said the doctors ought to testify about their diagnosis, that's ER 724, and it was defendant that withdrew the other witnesses and chose to proceed only with O'Connell Rutter, who examined defendant after the conspiracy ended. So it was defendant's strategic choice not to bring in testimony regarding these medical professional observations, which the court stated she would have allowed. And the Spangler case talks about where the defense's self-imposed limits, that is not a Sixth Amendment violation. Second, the exclusive testimony is not relevant to the counts of conviction. The testimony of Michael Sisson, Larry Nunez, and Kevin Ray were all before the counts that the jury convicted on. None of those witnesses were with defendant at Wounded Warrior. None of them have contemporaneous observations of the defendant while he was at Wounded Warrior on the counts that the jury convicted. And finally, there was significant evidence that did come in in support of this defense. Like I said, Camden Amey at ER 415 to 416 talked about some of the same things that Michael Sisson would have testified to. Kevin Ray and Alex Du talked about some of the immediate aftermath of the brain, of the concussion that led to, that is relevant to some of O'Pava Rutter and Tuller's testimony. And again, Tuller and O'Pava Rutter testified at length in support of this testimony. Because there was evidence that came in, the defense was entitled, was able to bring in this defense. There was no Sixth Amendment violation, as this court has repeatedly called. Was it a valid defense to knowledge? The defense was... What did you understand the defense today? Yes. Trial counsel numerously, many times, articulated that she was not bringing a diminished capacity defense. Instead, she wanted to introduce evidence that negated an element that the defendant knowingly submitted false claims and had the specific intent to aid in a bet. Whether I think it was a valid defense... I mean, would she have had to have gone forward if she was relying on medical and psychiatric testimony? Would the testimony have had to have been a typical insanity defense as opposed to something short of that? No. I believe based on... There's so much discussion in the record. And I believe the conclusion was that this was not an insanity defense. And the defense did not need to rise to the level of an insanity defense. What they were trying to show was that given the defendant's injuries, his TBI and his PTSD, and the resulting manifestations of that injury, his poor concentration, his lack of memory, his difficulty staying organized, that those things made it so that when he was receiving money in his account, he did not have... So you believe that that's an appropriate defense. It's just that they had sufficient evidence in the record to establish that excluding those lay witnesses was not error. Is that your position? Yes. That was a defense that was proposed. And that's a defense that was presented to the jury and I think was ultimately successful on the majority of the counts. And that's why the jury acquitted on those counts. I know my time is up, so unless the court has any additional questions for me, I'm out of breath. Thank you very much. Thank you very much. Ms. Conroy, thank you very much for your oral arguments here today. Ms. Conroy deserved to speak. Oh, I'm sorry. You're right. Sorry. You did... No, no. You had time. I'm sorry. Just briefly in regards to two points. As to the restitution finding, the only thing stated in the sentencing hearing made by the judge was a statement, it is ordered that the defendant shall pay restitution in the amount of $115,754.60. That's at ER 26-28. That was the entire statement. The judge didn't adopt the findings in the pre-sentence report? Exactly. The judge did not? The judge did not adopt. That was the only thing stated in regards to restitution. But the judge, because the judge presided over the trial, had a full record on which to make that determination. Do you agree? Absolutely. But she didn't. So that's why we're asking for the remand. The remand for what purpose then? What would happen on remand? Well, it was twofold. One, he disputed the amount due to the acquittals as well as the fact that he was entitled to compensation during the majority of the duration of the conspiracy. But he never presented any evidence of that during the sentencing, did he? Well, that was his argument in his sentencing papers that he was entitled to compensation. But I don't recall that he submitted any evidence, did he? Well, I thought the evidence at trial was that claims had been submitted and then according to, I believe it was Joseph Ewell, a lot of the claims he examined before they were submitted and then he examined after the fraud examiner came in and discovered many had been doctored with a whiteout. And that's quite apparent when you look through the claims that were filed. And so Mr. Jackson may have submitted a valid claim and Flores may have altered it. That's the way the testimony played out. For that reason, I would argue, though, that that was not actual loss and the judge did not make any specific findings. 32 and the Mandatory Victims Restitution Act required that. You didn't raise Rule 32 until your reply brief, correct? Well, I believe it was raised in my opening brief, but I'd have to double check and then objections were filed in the district court objecting to the calculation. And the final point I'd like to make is in Shannon, this court said you cannot give a deliberate indifference or ignorance instruction when there's evidence of either actual knowledge or no knowledge. And just as the government said today here and at trial, there was, according to them, overwhelming evidence of actual knowledge. This was not a case warranting a deliberate ignorance instruction. Thank you. Thank you. Again, I apologize, Ms. Conroy, for cutting you off there. But thank you both very much for your oral arguments here today. The case of United States of America v. Robert Jackson is submitted.
judges: Gould, Murguia, Amon